David F. Sugerman, OSB # 862984
SUGERMAN LAW OFFICE
707 SW Washington St., Ste. 600
Portland, OR  97205
Tel: 503-228-6474
Fax: 503-228-2556
david@sugermanlawoffice.com
*Lead Counsel*

Gabriel Chase, OSB # 142948
CHASE LAW, PC
621 S.W. Alder St., Ste. 600
Portland, OR 97205
Tel: 503-294-1414
Fax: 503-294-1455
gabriel@chaselawpc.net

Michelle R Burrows, OSB # 861606
MICHELLE R. BURROWS P.C.
1333 Orenco Station Parkway # 525
Hillsboro, OR 97124
Tel: 503-241-1955
michelle.r.burrows@gmail.com

Joe Piucci, OSB # 135325
PIUCCI LAW LLC
900 SW 13th Ave., Ste. 200
Portland, OR 97205
Tel: 503-228-7385
Fax: 503-228-2571
joe@piucci.com

Christopher A. Larsen, OSB # 910679
PICKETT DUMMIGAN MCCALL LLP
210 SW Morrison St., 4th Fl.
Portland, Oregon 97204
Tel: 503-223-7770
Fax: 503-227-5350
chris@pdm.legal

David D. Park, OSB # 803358
ELLIOTT & PARK, P.C.
0324 S.W. Abernethy Street
Portland, Oregon 97239-4356
Tel: 503-227-1690
Fax: 503-274-8384
dave@elliott-park.com

Jane L. Moisan, OSB # 181864
PEOPLE'S LAW PROJECT
818 S.W. 4th Ave. #221-3789
Portland, OR 97204
Tel: 971-258-1292
peopleslawproject@gmail.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ANGELICA CLARK, ELLEN GASS, NATHANIEL WEST, and ROWAN MAHER, Individually and on behalf of all similarly-situated individuals | Civil Action No. |
| Plaintiffs | |
| | CLASS ACTION ALLEGATION COMPLAINT |
| v. | Bivens Fourth Amendment Unlawful Arrest, Excessive Force |
| CHAD WOLF, Acting Secretary United States Department of Homeland Security; KENNETH T. CUCCINELLI, Senior Official Performing the Duties of the Deputy Secretary United States Department of Homeland Security; JOHN DOES 1-200, agents of the U.S. Marshals Service, Federal Protective Service, U.S. Department of Homeland Security and U.S. Customs and Border Protection, acting in concert and in their Individual capacities, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION ALLEGATION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff brings this complaint herein alleging as follows:

## INTRODUCTORY STATEMENT

"*We cannot understand our present moment without recognizing the lasting damage caused by allowing white supremacy and racial hierarchy to prevail . . .*" Bryan Stevenson, Director Equal Justice Initiative.

1.

On May 25th, 2020, a Black man named George Floyd was murdered in Minneapolis, MN, by Officer Derek Chauvin. Chauvin held his knee to Floyd's neck for at least eight minutes and 46 seconds while his fellow police officers stood by and casually watched Floyd die. Floyd's final words were, "I can't breathe." Chauvin and his fellow officers ignored the pleas for mercy coming from bystanders, including the teenage girl whose footage alerted the world to this particular instance of police brutality.

2.

Following George Floyd's gruesome public murder, protests erupted nationwide in support of the Black Lives Matter (BLM) movement and against systemic racism, police brutality and use of excessive force. Police met these protests with violence, brutality and excessive force.

3.

On May 28th, thousands of people began months of sustained protests in Portland. Portland Police Bureau officers met these protests with excessive force in the form of generalized violence, including the use of batons, pepper balls, sonic weapons and, most notably, tear gas, in the midst of a global pandemic that attacked respiratory systems.

4.

Between June 9, 2020 and June 30, 2020, emergency court orders, city directives, and new police reforms in state law placed limitations on the use of tear gas and other force.

5.

On June 26th, 2020, in reaction to the measures taken by state and local actors to de-escalate police violence against protesters, medics, legal observers, press, and the public,

President Trump issued Executive Order 13933, to unlawfully deploy federal agents to Portland. Following the deployment, unidentified agents in military fatigues emerged for the first time from the federal courthouse and engaged with members of the public as enemy combatants.

6.

On July 6, 2020, Kevin Sonoff, spokesperson for the Portland U.S. Attorney Billy Williams, indicated that the ostensible purpose of the deployment was to protect federal property and personnel.[1] However, immediately following their arrival, federal agents acted to quell nonviolent protesters by engaging in crowd-dispersal operations, deploying tear gas and impact munitions well beyond the immediate surroundings of federal property.

7.

Over the month of July, at the directive of President Trump, Acting DHS Secretary Chad Wolf, and Senior Official Performing the Duties of the DHS Deputy Secretary Kenneth Cuccinelli, the federal government unleashed unprecedented, sustained violence and intimidation on the people of Portland. Since their arrival, federal agents have escalated violence on a nightly basis by targeting nonviolent and non-resisting individuals for injury, assault, or arrest without probable cause. Federal agents chased down protesters, observers, medics, journalists, and even bystanders through the streets, pursuing them as many as ten blocks beyond federal property while simultaneously firing potentially lethal munitions including Pepper-spray balls, rubber bullets and flashbang grenades. Federal agents blanketed numerous blocks of Portland public streets surrounding the courthouse in toxic tear gas and chemical agents during a global pandemic, concealing or blocking the pathways for protestors to safely disperse. On their own

---

[1] https://www.opb.org/news/article/federal-law-enforcement-agencies-deployed-to-portland-protests-federal-buildings-personnel/

behalf and on behalf of others similarly situated, plaintiffs bring this action for declaratory relief and damages.

## JURISDICTION

8.

This action is brought pursuant to the Fourth Amendment to the United States Constitution and *Bivens v. Ten Unnamed Federal Officers*, 403 U.S. 388 (1971), for violations of Constitutional rights held by all citizens.

9.

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.

Plaintiffs are in the process of filing Form 95, giving notice under the Federal Tort Claims Act of intention to sue the United States for damages.

11.

Venue is proper under 28 U.S.C. § 1391(b), because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Oregon, because defendants are subject to personal jurisdiction in the District of Oregon

## PARTIES

12.

Plaintiffs and similarly situated individuals ("class members") attended one or more protests described in this lawsuit.

13.

Plaintiffs and class members gathered in downtown Portland near the Hatfield Courthouse to protest police violence in support of the Black Lives Matter movement. The class

consists of people who, between July 1 and July 30, 2020,  lawfully gathered in an area bounded by SW Taylor St. on the north, SW 2nd Ave. on the east, SW Madison St. on the south, and SW 4th Ave. ("protest zone")  on the west to protest police violence, who were exposed to teargas ("Tear Gas Class"). The following people are excluded from the class: defendants, class counsel and their employees, any judge who sits on this case and their judicial staff, and any juror appointed to serve on the jury that will hear and decide this case.

14.

In addition to the class, there are two subclasses.  The first subclass consists of members of the Tear Gas Class who were also hit by munitions in or near the protest zone, including less-lethal munition, tear gas cannisters, and sonic grenades ("Shooting Subclass"). The second subclass consists of members of the Tear Gas Class who were beaten by defendants in or near the protest zone ("Truncheon Subclass").

15.

Defendant Wolf is the Acting Secretary of the Department of Homeland Security. Defendant Cuccinelli is the Senior Official Performing the duties of the Deputy Secretary of the Department of Homeland Security. Based on information and belief, neither defendant Wolf nor Defendant Cuccinelli were lawfully appointed to their positions.

16.

The Doe Defendants have concealed their identities and their names and/or they are not yet fully known to plaintiff. On information and belief, Does 1-200 are federal agents dispatched to Portland, Oregon as part of "Operation Diligent Valor" in furtherance of the Executive Order of June 26, 2020 "On Protecting American Monuments, Memorials, and Statues and Combatting Recent Criminal Violence" pertaining to protection of federal property. Based on information

and belief, no more than three of defendants Does 1-200 are authorized to make arrests for non-federal offenses in Oregon nor to enforce state law. At least 197 of defendants Does 1-200 lack authority to enforce state law or to make arrests for non-federal offenses in Oregon. Each of said defendants is responsible for and integral participants with one another in the conduct alleged herein.

17.

Defendant John Does 1-50 are individual and supervisory officers of the U. S. Marshals Service, sued in their individual capacities. At all times material, said defendants were acting within the scope of their employment and under color of law.

18.

Defendant John Does 51-100 are individual and supervisory officers of the Federal Protective Service, sued in their individual capacities. At all times material, said defendants were acting within the scope of their employment and under color of law.

19.

Defendant John Does 101-150 are individual and supervisory officers of the U.S. Department of Homeland Security, sued in their individual capacities. At all times material, said defendants were acting within the scope of their employment and under color of law.

20.

Defendant John Does 151-200 are individual and supervisory officers of the U.S. Customs and Border Protection, sued in their individual capacities. At all times material, said defendants were acting within the scope of their employment and under color of law.

21.

Plaintiff reserves the right to amend and add additional Defendants as discovery proceeds, including without limitation, any supervisor or individual involved in the events alleged in this complaint.

## CLASS ALLEGATIONS

22.

Based on media reports, thousands gathered in the protest zone in evenings between July 1, and July 30, 2020, and the gathered crowds were exposed to teargas. Based on media reports, the class is so numerous that joinder is impracticable (Fed. R. Civ. P. 23(a)(1).

23.

There are questions of law or fact common to the class (Fed. R. Civ. P. 23(a)(2), including:

A. The identities of Does 1-200;

B. The employers of Does 1-200;

C. The legal authority under which Does 1-200 acted;

D. Whether use of tear gas for crowd control violated the 4th Amendment rights of members of the Tear Gas Class;

E. The use of force policies under which Does 1-200 operated;

F. The use of force training provided to Does 1-200;

G. The use of force practices employed by Does 1-200;

H. The crowd control policies under which Does 1-200 operated;

I. The crowd control training provided to Does 1-200;

J. The crowd control practices employed by Does 1-200;

K.  The authority under which Does 1-200 were operating at the time they were deployed to Portland, including their authority to use force beyond the perimeter of federal buildings and their authority to pursue, gas, beat, shoot, and arrest protesters beyond the perimeter of federal buildings;

L.  Whether Does 1-200 were authorized to use tear gas and fire munitions at plaintiffs and members of the class who posed no threat to Does 1-200;

M.  Whether each of Does 1-200 who deployed crowd control weapons and munitions were trained and certified in the use of those weapons and munitions;

N.  Whether, and under what circumstances, plaintiffs and members of the class are entitled to obtain and review protest zone surveillance information and data pertaining to members of the class;

O.  Whether Does 1-200 have in fact withdrawn from Portland;

P.  Whether plaintiffs and members of the classes are entitled to declaratory relief;

Q.  Whether qualified immunity is an available defense to the damages claims;

R.  Whether if qualified immunity is an available defense, the legal effect of the proceedings and injunction issued in in *Don't Shoot Portland, et al v. City of Portland*, US District Court Case No. 20-cv-917-HZ (D. Or.);

*S.*  The legal effect of the temporary restraining order, preliminary injunction, and proceedings in *Index Newspapers LLC, et al v. City of Portland, et al*, US District Court Case No. 20-cv-1035-SI (D. Or.);

T.  The admissibility of statements made by President Trump;

U.  The admissibility of statements made by certain federal officials;

V.  Whether plaintiffs and members of the classes state claims for which relief may be

granted Fed. R. Civ. P. 12(b)(6); and

W.  Whether plaintiffs and members of the classes are entitled to recover money damages.

24.

The claims or defenses of the representative parties are typical of the claims or defenses

of the classes, in that all suffered similar injuries from the same conduct, and all seek the same

relief.

25.

The representative parties will fairly and adequately protect the interests of the class, in

that they have identical claims, they have no disabling conflicts of interest, and they have

retained counsel with decades of experience handling class actions, mass torts, police misconduct

cases, civil rights cases, and personal injury cases. Class counsel includes counsel with extensive

experience, including trial, appeal, and settlement of class actions and complex cases in federal

and state courts, police misconduct cases, civil rights cases, and injury cases.

26.

A class action may be maintained because defendants have acted or refused to act on

grounds that apply generally to the class, so that declaratory relief is appropriate. Fed. R. Civ. P.

23(b)(2). As well, a class maintained because common questions of law or fact predominate over

any questions affecting only individual members, and a class action is superior to other available

methods of fairly and efficiently adjudicating the controversy (Fed. R. Civ. P. 23(b)(3)), in that:

A.  The vast majority of class members have little interest in individually controlling the

prosecution of separate actions;

B.  As to these proposed classes, counsel are unaware of any other class actions for damages and know of only a few potential cases that may be filed individually, the bulk of which involve protesters with serious and permanent physical injuries from shootings;

C.  The harms giving rise to this litigation occurred in or near a zone adjacent to Hatfield courthouse. It is desirable to concentrate the litigation in Oregon; and

D.  The likely difficulties in managing a class action arise from issues of confirmation of class membership. However, that issue may be largely resolved by using government surveillance from the protest zone to confirm class members' identities, to the extent that is necessary. As well, issues related to actual injury and extent of injury may be managed through a claims or administrative process.

## **GENERAL FACTS**

### **George Floyd Death May 25, 2020**

27.

Protests across the country have been met with a police system which has become highly militarized, heavily armed and completely distant from the communities they serve. The police response to many of the protests involve needless beatings, use of extreme measures by officers in gear which appear to be more like soldiers than police officers.



28.

Protests in Portland, Oregon in reaction to Mr. Floyd's death commenced in May 2020 and have continued each night for more than 88 nights, as of the date filing. While protests have been held all over the City of Portland, in July demonstrators have tended to merge and gather into the evenings around the United States Courthouse on S.W. 3rd Avenue in downtown Portland and the three park blocks directly west of the courthouse; as well as the Multnomah County Justice Center to the south. Protesters report being chased or followed by federal agents as far west as I-405, approximately ten blocks from the Mark O. Hatfield Federal Courthouse.



**Incursion of Federal Agents**

29.

On July 1, 2020, the Trump administration deployed federal law enforcement officers and agents to Portland, Oregon. According to a statement made by Kevin Sonoff, spokesperson for the Portland U.S. Attorney, Billy Williams, on July 6, 2020, the ostensible purpose of the

deployment was to protect federal property and personnel.[2] However, immediately following their arrival, federal agents engaged in crowd-dispersal operations, deploying tear gas and impact munitions well beyond the immediate surroundings of federal property and with the apparent purpose of quelling lawful protests in support of Black lives rather than protecting federal property.

30.

It appears all or most of the federal agents deployed to Portland are not adequately trained in the First Amendment rights to assemble and protest, nor mass demonstrations, crowd control and riot control.[3]

31.

Since their arrival, federal agents have failed to employ de-escalation strategies or tactics to mitigate violence and protect the rights of peaceable assembly and protest. Instead, federal agents have escalated violence on a nightly basis by targeting peaceful and lawfully dispersing individuals for injury or assault without probable cause, pursuing protesters, observers and journalists through the streets blocks beyond federal property while simultaneously firing Pepper-spray balls, rubber bullets and other munitions at them, and blanketing several blocks of Portland streets surrounding the courthouse in tear gas and flashbang devices, concealing the pathways for protestors to safely disperse.

32.

On or after July 22, the federal agents built a chain link fence around the courthouse and reinforced it with plywood and concrete blocks. The ferocity, frequency, and amount of force

---

[2] https://www.opb.org/news/article/federal-law-enforcement-agencies-deployed-to-portland-protests-federal-buildings-personnel/
[3] https://www.nytimes.com/2020/07/18/us/portland-protests.html

used against members of the public escalated. At the direction of supervisors, federal agents also fired munitions from within the safety of the fenced-in portion of the front steps of the courthouse and from safe positions several stories up in the federal courthouse into crowds of nonviolent, passively resistant protestors and others.



Tear gas deployed from elevated positions while crowd is standing below.

33.

On July 23, 2020, United States District Judge Michael Simon issued a temporary restraining order ("TRO") in Index Newspapers, LLC, et al v. City of Portland, et al, USDC Case No. 20-cv-1035-SI, exempting journalists and legal observers from orders to disperse and restraining federal defendants U.S. Department of Homeland Security and U.S. Marshals Service from arresting, threatening to arrest, or using physical force directed against any person who they know or reasonably should know is a journalist or legal observer. The TRO anticipates,

consistent with the U.S. Constitution and federal law, that "lawful crowd-dispersal orders" will be issued prior to the deployment of crowd-control devices.

34.

On or about July 23, 2020, following the entry of a temporary restraining order against federal officials involved in the July protest response, defendant Cuccinelli sent and email to Defendant Wolf in reference to the TRO, saying, "It's offensive, but shouldn't affect anything we're doing."

35.

Indeed, the federal defendants did not alter their behavior and deployed and directed excessive force at plaintiffs and members of the class.

36.

Federal agents have used tear gas in a predictable and frequently unlawful pattern. Nightly, between approximately 11:30 p.m. and 1:00 a.m., federal agents emerge from the federal courthouse and fire tear gas and toss and launch flashbang grenades into SW Third Street, Lownsdale Park and SW Fourth Street, sometimes without any prior warning and regardless of whether there have been triggering acts of protester violence, property damage or threats (tossed bottles and fireworks) toward federal agents (all of whom are wearing gas masks and full protective riot gear and located either safely inside the courthouse or behind a fence and other protective barriers outside the courthouse).

37.

After an initial volley of tear gas and flashbang grenades, federal agents commence firing pepper balls through and over the fencing at protestors and flood the street, shooting protesters with rubber bullets, pepper-spray balls, and other impact munitions regardless of whether they

have been engaged in acts of violence, or are peacefully dispersing or leaving the area or are in

retreat, and even when they are moving away from federal property or standing blocks away

from the federal courthouse and posing no possible threat to federal property, federal agents or

others.

### Right to Protest

38.

Demonstrations, protest marches, and picketing are clearly protected by the First

Amendment. People have a right to demonstrate and protest the actions of government officials,

including police officers, without fear for their safety and "[i]t has been clearly established since

time immemorial that city streets and sidewalks are public fora." *Collins v. Jordan*, 110 F.3d

1363, 1371 (9th Cir 1996).

39.

The government may not prohibit angry or inflammatory speech in a public forum unless

it is (1) directed to inciting or producing imminent lawless action *and* (2) likely to incite or

produce such action. *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d

430 (1969) (per curiam). Speech that stirs passions, resentment or anger is fully protected by the

First Amendment. *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131

(1949) ("[A] function of free speech under our system of government is to invite dispute. It may

indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction

with conditions as they are, or even stirs people to anger.").

### Status of Protestor Rights Prior to Incursion of Federal Agents

40.

On June 9, 2020, Judge Marco Hernandez issued a temporary restraining order in *Don't*

*Shoot Portland, et al v. City of Portland*, US District Court Case No. 20-cv-917-HZ, prohibiting

the City of Portland, Portland Police Bureau, from use of tear gas except when lives or safety of

the public or the police are at risk. In entering the order, Judge Hernandez specifically found:

> [T]here is evidence that officers have violated the constitutional
> rights of peaceful protestors, as well as their own department's
> internal directives and guidelines. Limiting the use of tear gas may
> mean that officers are unable to stop some property damage. But the
> unconstrained use of tear gas cannot weigh in the public's interest
> when this use is likely to exacerbate the transmission of COVID-19,
> for those engaged in peaceful protest as well as the community at
> large. The Court therefore finds that the public interest weighs in
> favor of granting a TRO in this case.

41.

On June 26, 2020, pursuant to stipulation, Judge Hernandez extended the restraining

order entered in *Don't Shoot Portland* through July 24, 2020 and expanded its scope to restrict

use of the following munitions in connection with crowd control:

> (1) FN303s and 40MM less lethal launchers with or without OC
> payload are limited to use as outlined in PPB Use of Force Directive
> 1010, and in addition shall not be used where people engaged in
> passive resistance are likely to be subjected to the force.

> (2) Rubber Ball Distraction Devices ("RBDD") shall be limited to use
> as outlined in PPB Use of Force Directive 1010. In addition, use of
> RBDD shall be limited to situations in which the lives or safety of
> the public or the police are at risk and shall not be used to disperse
> crowds where there is no or little risk of injury.

> (3) Aerosol restraints (handheld OC or "pepper spray") shall not be used
> against persons engaged in passive resistance, and consistent with
> PPB Use of Force Directive 1010, members shall minimize
> exposure to non-targeted persons.

> (4) Long Range Acoustical Devices ("LRAD") shall be prohibited for
> use as a warning signal or distraction tactic and shall be used for
> announcements only. "Passive resistance" as used above means a
> person's non-cooperation with a member that does not involve
> violence or other active conduct by the individual.

42.

On June 30, 2020, Governor Brown signed House Bill 4208 into law, which prohibits the use of teargas on a crowd absent circumstances that constitute a "riot" and absent fair notice, consisting of: a) an announcement of the agency's intent to use tear gas; b) allowance of sufficient time for individuals to evacuate the area; and c) a second announcement of intent to use tear gas immediately before its use.

43.

Every night of July 2020, Defendants attacked nonviolent, non-resisting protesters.

44.

On July 28, 2020, and in direct response to the federal agents' unlawful actions, the Index Newspapers plaintiffs filed a Motion for Contempt and Sanctions Against Federal Defendants, which is now pending.

45.

On July 29, 2020, Governor Kate Brown announced she had reached an agreement with the United States to withdraw all federal agents from the Portland protest effort no later than August 4, 2020.[4]

46.

On July 30, 2020, President Trump Tweeted:

---

[4] . https://www.opb.org/article/2020/07/29/oregon-portland-deal-announced-federal-officers-phased-removal/



https://twitter.com/realDonaldTrump/status/1288826742539464707?s=20

47.

The day of Governor Brown's announcement, the federal agents still occupying the federal courthouse in Portland reportedly increased their use of force and appeared to be defiantly ignoring any efforts or attempts to reduce violence and unlawful use of force.[5]

**Characteristics of Crowd Control Devices Deployed by Federal Agents**

**A. Chemical Agents**

48.

"Tear gas" is a group of chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs and skin.[6] It is a form of poison. People may experience some or all of the following symptoms immediately after exposure:

---

[5] https://www.theguardian.com/us-news/2020/jul/30/federal-agents-portland-oregon-trump-troops

[6] https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp

excessive tearing, burning, blurred vision and redness of the eyes, runny nose, burning and swelling within the nose, difficulty swallowing and drooling, chest tightness, coughing, choking sensation, wheezing, shortness of breath, burns and rash on the skin, nausea and vomiting. It can bring on an asthma attack. Prolonged exposure or a large dose of gas may cause blindness, glaucoma, or immediate death due to severe chemical burns to throat and lungs and respiratory failure. There is also anecdotal evidence that tear gas may cause reproductive health concerns for people with uteruses including miscarriages.[7]

49.

"Pepper-spray" and "OC" (oleoresin capsicum) aerosols are chemical compounds derived from chilli peppers. Capsaicin is the compound that makes chili peppers spicy hot. There are powder forms of these compounds, as well. Pepper-spray, similar to tear gas, attacks mucous membranes in the eyes and respiratory system, forcing eyes to close and flood with tears and generating coughing fits and difficulty in breathing. Pepper-spray also induces an intense burning sensation. The immediate effects can last anywhere from 15 minutes to one hour or more.

50.

"Pepper-spray balls" are round plastic projectiles that release a powdered substance on impact that has effects similar to pepper spray. Pepper-spray balls are fired from a pistol or AR-15 like "launcher" using compressed air. Some varieties of launchers allow for adjustable kinetic impact. In addition to the dangers of pepper spray, pepper-spray balls carry the dangers inherent in any projectile that is shot at someone up to and including blindness, cuts, abrasions, bruising,

---

[7] https://www.salon.com/2020/07/28/experts-alarmed-at-reports-of-expired-tear-gas-being-sprayed-on-protesters/

skin welts and concussion. Their accuracy declines over relatively short distances, creating a high risk of bystander injury.

## B. Kinetic Impact Projectiles

### 51.

"Rubber bullets or pellets," "baton rounds," "sponge rounds" and "bean bag" rounds are lightweight, high-speed kinetic impact projectiles fired from a rifle-like "launcher" or shotgun at velocities similar to live ammunition, but their design causes a rapid slowdown during flight. They are loosely designed to duplicate the impact of a baton strike from a distance at or beyond 60 feet. The rounds deliver the same kinetic force as a 90 mile per hour major league baseball pitch. If struck in the head, face, eye, neck, kidney or groin, they can produce grievous injuries or death.[8] Their accuracy declines over relatively short distances creating a high risk of bystander injury.

## C. Disorientation Devices

### 52.

"Disorientation devices" or "flashbangs" or "stun grenades" create a loud explosion and/or a very bright flash of light. They are made of both metal and plastic parts that may fragment during the explosion and carry risks of blast injuries and hearing loss. They may be deployed by hand or by a launcher. Explosions in close proximity to a person can cause or lead to amputation, fractures, burns, blindness and other serious injuries. It is impossible to control exactly where a grenade detonates.

---

[8] https://phr.org/wp-content/uploads/2018/09/lethal-in-disguise.pdf

## Surveillance of Protesters

### 53.

Based on information and belief, government agencies, defendants, and Does 1-200 obtained surveillance of protesters in and around the protest zone, including video and data images from fixed and mobile cameras, cell phone data, drone footage, and other digital media. This surveillance information provides independent confirmation of class membership. In addition, it provides important evidence of the conduct of defendants and proof of the claims of plaintiffs and the class.

## Defendants' Violations of Plaintiff's Constitutional Rights

### 54.

Plaintiffs Clark, Gass, West, and Maher attended the Black Lives Matter protests in July 2020 and were exposed to tear gas on one or more occasions as set out in more detail below. In addition, plaintiffs Clark, Gass, and Maher were struck by munitions, plaintiff West was harmed by a concussion grenade, and plaintiff Maher was beaten.

### 55.

Defendants violated plaintiffs and class members Fourth Amendment rights in one or more of the following ways:

A. Defendants repeatedly used tear gas indiscriminately on plaintiffs and class members, who at all material times were engaged in peaceful, lawful protests;

B. Defendants departed federal property and entered municipal streets and parks while chasing protesters and spraying them with tear gas, lobbing percussion grenades, firing impact munitions, and generally assaulting the protesters without lawful purpose or objective; and

C.  One or more of defendants' supervisors or authorized representatives have communicated via social media, press releases and press conference they are aware their activities lack probable cause and they are ordered to use force and make arrests despite the lack of legal authority and justification.

56.

Plaintiff Clark attended demonstrations and was exposed to tear gas in the protest zone on July 25-26, 2020. As a result of exposures to the tear gas, plaintiff Clark suffered pain, discomfort, respiratory distress, temporary blindness, and temporary loss of mobility. In addition, on July 26, 2020, at approximately 2:00 am, plaintiff Clark was struck in the hand by munitions fired while she was standing near the corner of SW 4th Ave. and Salmon St. The munitions caused pain, bruising, blistering, and fear. At all times, plaintiff Clark lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

57.

Plaintiff Gass attended demonstrations and was exposed to tear gas in the protest zone on July 24, 2020. As a result of exposures to the tear gas, plaintiff Gass suffered pain, discomfort, mental distress, respiratory distress, temporary blindness, and temporary loss of mobility. In addition, on the same day, plaintiff Gass was struck in the left foot by impact munitions fired while standing in the protest zone among a group of nonviolent, peaceful protesters. Plaintiff Gass was also struck by pepper-spray balls in the head and face causing pain and discomfort. The impact munitions broke plaintiff Gass's great toe, causing pain and suffering, and interference with normal activities of daily life. At all times, plaintiff Gass lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

58.

Plaintiff West attended demonstrations and was exposed to tear gas in the protest zone on the following days: July 21, 22, 24, and 25. As a result of exposures to the tear gas, plaintiff West suffered pain, discomfort, mental distress, respiratory distress, temporary blindness, and temporary loss of mobility. In addition, on July 25, one or more defendants fired stun grenades close to plaintiff West, which detonated close to him, causing hearing loss, pain, and disorientation. At all times, plaintiff West lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

59.

Plaintiff Maher attended demonstrations and was exposed to tear gas in the protest zone on the following days: July 21-22, July 23-24, July 25-26, and July 29-30. As a result of exposures to the tear gas, plaintiff Maher suffered pain, discomfort, respiratory distress, temporary blindness, and temporary loss of mobility. In addition, plaintiff Maher suffered the following additional harms:

A. On July 22, at approximately 12:30-1:00 am, a federal agent wearing military camouflage fatigues beat plaintiff Maher with a baton while she was walking away from the federal courthouse near Lownsdale Square. As a result of this beating, plaintiff Maher suffered pain, bruising, and fear.

B. On July 22, at approximately 2:00-3:00 am, plaintiff Maher was struck in the head by munitions fired while standing on SW Main St. between 5th and 6th Ave. The munition was a "pepper-spray ball," which impacted her bike helmet and remains lodged within.

As a result of this shooting, plaintiff Maher suffered fear and concern for her safety. At all times, plaintiff Maher lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

60.

Defendants used and applied force against plaintiffs and members of the class without a clearly communicated warning, without a lawful determination and announcement that plaintiffs and members of the class were unlawfully assembled, and without first clearly communicating a lawful order to disperse.

## FIRST CLAIM FOR RELIEF: Unreasonable Use of Force

*Bivens* - Fourth Amendment

61.

Plaintiffs reallege all previous paragraphs as if fully set forth herein.

62.

Plaintiffs and members of the class are entitled to be free from unlawful seizure of their person pursuant to the parameters of the 4th Amendment to the United States Constitution. Plaintiffs and members of the class are also entitled to be free from undue, unreasonable, and deadly force, including:

A.  The use of tear gas without lawful justification, for the sole purpose of crowd dispersal, or as a pain compliance tool;

B.  The shooting of pepper-spray balls indiscriminately or directly at their person, including when displaying no violence or resistance, or when their back is turned while attempting to retreat or obey an order to disperse;

C.  The spraying of pepper spray to inhibit their ability to see;

D.  The beating of their person with batons, fists, or other weapons;

E.  Arrest without probable cause, and

F.  Exploding grenades designed to disorient and confuse rather than to rebut force,
    effect a custodial arrest or preserve life and safety.

63.

The defendants did not have, at any time, a legally valid basis to seize plaintiffs and
members of the class and, at all times material, lacked an objectively reasonable belief that
plaintiffs and members of the class presented an imminent and serious danger to themselves or
others. As such, Defendants' use of force violated the Fourth Amendment restriction on use of
force.

64.

The defendants unlawfully seized plaintiffs and members of the class by means of
excessive physical force, including the use of chemical agents, kinetic impact munitions and
diversionary devices as described above.

65.

The defendants had no warrants authorizing any seizure of plaintiffs and members of the
class.

66.

Each of the defendants failed to intervene to prevent the other defendants from violating
the constitutional rights of plaintiffs and members of the class and is liable for their failure to act
to protect protesters.

67.

Defendants failed to ascertain or ignored all reasonable and objective facts and their acts and omissions were objectively unreasonable in light of the circumstances confronting them for reasons which, based on information presently known to plaintiffs and members of the class, include the following:

A. Defendants gave no or inadequate warning of their intention to use force, even though it was reasonably feasible for them to do so;

B. Defendants gave no directions or instructions to plaintiffs or members of the class as to how or in what direction to safely evacuate the area;

C. Defendants lacked reasonable cause to believe that plaintiffs or members of the class had committed a crime, posed a threat to the safety of the defendants or others, or were resisting arrest or attempting to evade arrest by flight;

D. Defendant lacked reasonable cause to believe that plaintiffs or members of the class had displayed aggression or engaged in violent conduct;

E. Defendants gratuitously inflicted pain on plaintiffs and members of the class in a manner that was not a reasonable response to the circumstances;

F. Defendants intentionally used and applied force that was capable of causing serious and permanent injury and was grossly disproportionate to any threat presented by plaintiffs and members of the class;

G. When defendants used and applied force, defendants knew the weapons and munitions they were using were capable of causing serious and permanent injury, were inaccurate and unreliable at the distances from which they were deploying them and could not be deployed without risk of hitting individuals in vulnerable areas nor

endangering persons, such as plaintiffs and members of the class, against whom no

such use of force was reasonable nor sanctioned under the Fourth Amendment;

H.   Upon information and belief, defendants failed to follow the federal government's

own policy and training regarding preservation of First Amendment rights and use of

force in connection with crowd control and riot tactics and ignored well-established

legal principles regarding the use of force;

I.   Defendants recklessly or deliberately created their own exigency when none would

otherwise have existed;

J.   Defendants used inaccurate information or ignored information to justify using force

against plaintiff; and

K.   Defendants failed to de-escalate and in fact escalated their use of force without

probable cause or justification.

68.

At all times material, the law was clearly established that defendants' use of force, in the

manner and under the circumstances used against plaintiffs and members of the class, was

objectively unreasonable and any reasonable federal agent defendant would have known that the

force used against plaintiffs and members of the class was unreasonable and violated their clearly

established Fourth Amendment rights. Defendants' conduct was well-defined by law and each

defendant knew or should have known that their conduct was not only well below the standard

prescribed by law, but illegal *per se.*

69.

If defendants claim to have declared an unlawful assembly and given fair warning to

disperse, which plaintiff denies, defendants failed to use reasonable means to amplify their

voices so that they could be heard by nonviolent, passively resisting protestors, journalists, legal observers and others. Defendants did not provide instructions how plaintiffs and members of the class should comply with dispersal orders and did not allow plaintiffs and members of the class a reasonable amount of time to comply before defendants commenced use of force.

70.

As a direct and proximate result of defendants' unconstitutional and retaliatory acts, plaintiffs and members of the class suffered physical injury and mental harms, outrage, betrayal, offense, indignity and insult causing damage in amounts to be determined at trial.

71.

Plaintiffs and members of the class are entitled to an award of punitive damages against defendants to punish and deter them and others from similar deprivations of constitutional rights in the future.

**SECOND CLAIM FOR RELIEF: *Unlawful Arrest or Detention***

*Bivens* - Fourth Amendment

72.

Plaintiffs reallege all previous paragraphs as if fully set forth herein.

73.

Plaintiffs and members of the class have the right under the Fourth Amendment of the United States Constitution to be free from unlawful arrest or detention that is not based on a probable cause belief that the particular person is committing a crime or about to commit a crime. Plaintiffs and members of the class are entitled to be free from unwarranted detention absent probable cause.

74.

As a result of defendants' conduct, plaintiff and members of the class were detained by the defendant federal agents in that they were immobilized by tear gas.

75.

At all times material, the law was clearly established that defendants' seizure of plaintiffs and class members in the manner and under the circumstances was unreasonable and any objectively reasonable federal agent defendant would have known that the seizure of plaintiffs and class members violated their clearly established Fourth Amendment right. Defendants' conduct was well-defined by law and each defendant knew or should have known that their conduct was not only well below the standard prescribed by law, but illegal *per se*.

76.

As a direct and proximate result of defendants' unconstitutional and retaliatory acts, plaintiffs and class members suffered physical injury and mental harms, outrage, betrayal, offense, indignity and insult causing damage in amounts to be determined at trial.

77.

Plaintiffs and members of the class are entitled to an award of punitive damages against defendants to punish and deter them and others from similar deprivations of constitutional rights in the future.

**THIRD CLAIM FOR RELIEF--DECLARATORY JUDGMENT**

78.

Based on information and belief, defendants remain in Oregon and, based on statements of President Trump and others, may again use similar force in Portland against protesters like plaintiffs and members of the class. Plaintiffs and members of the class intend to continue

exercising their free speech rights and rights of association in support of the Black Lives Matter movement.

79.

There exists a controversy of sufficient immediacy to warrant issuing a declaratory judgment that indiscriminate use of tear gas on peaceful protesters engaged in protected acts of assembly, speech, and expression violates the First Amendment rights of peaceful protesters.

80.

A judicial declaration is necessary and appropriate so that plaintiffs and members of the class may be assured that their rights to engage in constitutionally protected speech, assembly, and expressive conduct remain intact and that they do not risk physical harm, excessive force, or unlawful seizure by engaging in such protected activities.

81.

Plaintiffs and members of the class are entitled to a declaratory judgment that defendants may not indiscriminately use tear gas, shoot, or beat them while they are engaged in constitutionally protected assembly, speech, and expressive conduct.

WHEREFORE plaintiff prays for judgment against defendants, and each of them, as follows:

1.    For compensatory noneconomic and economic damages in an amount to be determined by a jury and for prejudgment interest on said sums;

2.    For punitive damages;

3.    For a declaratory relief;

4.    For plaintiff's costs and such other and further relief as the Court may deem just and equitable; and

5.      Plaintiff demands a jury trial for all matters triable of right to a jury.


DATED this August 24, 2020.

                       Respectfully submitted,


                       __/s/ David F. Sugerman_____
                       David F. Sugerman, OSB # 862984
                       SUGERMAN LAW OFFICE
                       707 SW Washington St., Ste. 600
                       Portland, OR  97205
                       Tel: 503-228-6474
                       Fax: 503-228-2556
                       david@sugermanlawoffice.com
                       *Lead Counsel*