1               IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                        PORTLAND DIVISION

4
    ANGELICA CLARK, et al.              )
5                                       )
                           Plaintiffs,  )  Case No. 3:20-cv-01436-IM
6                                       )
                      v.                )
7                                       )  January 12, 2022
    CHAD WOLF, Acting Secretary         )
8   United States Department of         )
    Homeland Security, et al.           )
9                                       )
                           Defendants.  )
10  _____   )

11

12              TELEPHONIC STATUS CONFERENCE

13                TRANSCRIPT OF PROCEEDINGS

14        BEFORE THE HONORABLE KARIN J. IMMERGUT

15          UNITED STATES DISTRICT COURT JUDGE

16

17

18

19

20

21

22

23

24

25

```
 1                      TELEPHONIC APPEARANCES

 2   FOR THE PLAINTIFF(S): DAVID D. PARK
                           Elliott & Park, PC
 3                         0324 S Abernethy Street
                           Portland, OR 97239
 4
     FOR THE PLAINTIFF(S): DAVID F. SUGERMAN
 5                         Sugerman Law Office
                           707 SW Washington Street
 6                         Suite 600
                           Portland, OR 97205
 7
     FOR THE PLAINTIFF(S): MICHELLE R. BURROWS
 8                         Michelle R. Burrows, PC
                           1333 NE Orenco Station Pkwy
 9                         Suite 525
                           Hillsboro, OR 97124
10
     FOR THE PLAINTIFF(S): NADIA H. DAHAB
11                         Sugerman Law Office
                           707 SW Washington Street
12                         Suite 600
                           Portland, OR 97205
13
     FOR THE PLAINTIFF(S): JANE L. MOISAN
14                         People's Law Project
                           818 SW 4th Avenue
15                         # 221-3789
                           Portland, OR 97204
16   FOR THE DEFENDANT(S):
                           GLENN GREENE
17                         DOJ-Civ
                           P.O. Box 7146
18                         Washington, DC 20044

19   FOR DHS and THE MARSHALS SERVICE:  MICHAEL P. CLENDENEN
                           Trial Attorney
20                         U.S. Department of Justice
                           Civil Division, Federal Programs Branch
21                         1100 L Street, NW
                           Washington, DC 20530
22
     COURT REPORTER:     Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
23                       United States District Courthouse
                         1000 SW Third Avenue, Room 301
24                       Portland, OR 97204
                         (503)326-8191
25
```

```
1                       TRANSCRIPT OF PROCEEDINGS

2                          (January 12, 2022)

3   (Telephonic oral argument:)

4               DEPUTY COURTROOM CLERK:  This United States District

5   Court is now in session.  The Honorable Karin J. Immergut

6   presiding.

7               THE COURT:  Good morning, everyone.  We're here on

8   the record in Clark, et al. v. Chad Wolf, et al.

9   Case 20-cv-01436.  This was the time set by the Court for oral

10  argument on motion to dismiss filed by Defendants Burger,

11  Cline, Jones, Morgan, Russell, and Smith.

12      Counsel, I'm going to have you state your appearances for

13  the record.

14      First, I'll start with plaintiffs' counsel.  Do we have

15  David Park?

16              MR. PARK:  Yes, Your Honor.  David Park appearing for

17  plaintiff.

18              THE COURT:  Okay.  And, Mr. Park, who is speaking on

19  behalf of plaintiffs today?

20              MR. PARK:  Nadia Dahab.

21              THE COURT:  Perfect.

22      And then we have -- I'm just doing it in the order that

23  you're listed -- Jane Moisan.

24              MS. MOISAN:  Good morning, Your Honor.  Jane Moisan

25  for plaintiff.
```

```
 1                    THE COURT:  Thank you.

 2          And Michelle Burrows?

 3                    MS. BURROWS:  Yes, Your Honor.  I'm here.

 4                    THE COURT:  And Nadia Dahab?

 5                    MS. DAHAB:  Yes.  Good morning, Your Honor.

 6                    THE COURT:  Good morning.

 7          And then for -- Ms. Dahab, did I get everybody who is

 8     supposed to be on the record?

 9                    MS. DAHAB:  I think we also have David Sugerman on

10     the phone with us this morning.

11                    THE COURT:  All right.  Mr. Sugerman, are you there?

12                    MR. SUGERMAN:  Yes, Your Honor.  Good morning.

13     Appearing by phone and muting.

14                    THE COURT:  All right.  Thank you.

15          And, Ms. Dahab, can -- are you able to see and hear me

16     okay?

17                    MS. DAHAB:  Yes, I am.  Thank you, Your Honor.

18                    THE COURT:  All right.  Thank you.

19          And then for defense, do we have Glenn Greene?

20                    MR. GREENE:  Good morning, Your Honor.  Glenn Greene

21     on behalf of the six individual capacity defendants.

22                    THE COURT:  Thank you.

23          And Michael Clendenen?

24                    MR. CLENDENEN:  Good morning, Your Honor.

25     Mike Clendenen here for the United States.
```

1          THE COURT:  All right.  Thank you.  And same for -- I

2    know -- Mr. Clendenen, I think you're going to argue the

3    discovery motion, and Mr. Greene will argue the motion to

4    dismiss; is that correct?

5          MR. CLENDENEN:  Yes, Your Honor.

6          THE COURT:  So if at any time folks can't hear, do

7    wave and get my attention.  I know sometimes we seem to lose

8    connection.  Hopefully that won't happen.

9          I thought I would first start by telling you just what my

10   plan is for today's hearing.  I did want to start by addressing

11   the defendants' motion to dismiss brought by the supervisory

12   agents, and then I'll go to the motion to compel discovery, and

13   then I would like to just discuss generally, I suppose, the

14   status of the case and the status of service, who has been --

15   has anyone else been served, et cetera, and just where the case

16   is going.

17         So I think for the -- probably it's most helpful if you

18   have what my inclination is for the motion to dismiss brought.

19   Obviously, this complaint is brought under *Bivens* on behalf of

20   those who were allegedly detained without probable cause and

21   subjected to excessive force while in the protest zone in

22   downtown Portland between July 1, 2020, and July 30, 2020.

23   That's the allegation.

24         It is my inclination that the supervisory defendants who

25   are bringing this motion to dismiss are in a similar position

1    to the prior defendants -- Chad Wolf and Ken Cuccinelli.

2    They -- and that it would be -- my inclination is that the case

3    against them should be dismissed because it stretches the

4    implied cause of action under *Bivens* outside of the context in

5    which it was intended, which the Supreme Court has cautioned

6    against, and for the same rationale I dismissed the others,

7    it's my inclination that the same result should happen here.

8         So I think the focus, probably, Ms. Dahab, for you is --

9    and I'll hear both why I'm wrong, from your perspective, and

10   why Mr. Greene thinks I'm right, I suppose.  If you could start

11   by -- let me ask you a couple of things that would be helpful

12   to frame your argument, and of course I'll hear -- I'm just

13   saying that's my inclination based on my review of all your

14   pleadings and the record.  But it would be helpful to me if you

15   would walk through concretely in the complaint the direct

16   relationship between any of these named defendants and the

17   specific actions you allege, particularly with regard to the

18   named plaintiffs, and I'm still struggling a little bit in this

19   case because it's alleged as a class.  Obviously, we have made

20   no determination about whether a class is appropriate or

21   whether even a class is possible for the pure gap under *Bivens*,

22   but that's presumably for a later time.

23        But certainly *Bivens* requires that -- or doesn't allow

24   claims based on vicarious liability or respondeat superior, but

25   there has to be direct involvement of these particular

1   defendants.  So if you could focus your argument really on that

2   piece of it, that would be very helpful.

3       The second is with regard to the argument that the

4   defendants make in their briefing, that really this is a

5   challenge to a government policy and, you know, does the

6   government get to use the munitions that they used that you are

7   alleging are part of the excessive force and whether tear gas

8   constitutes an arrest.  Those are all issues that seem to go --

9   at least defendants argue those would go to policies that are

10  not appropriate for *Bivens* to apply in that context.  That is

11  not an appropriate context in which *Bivens* can be applied and

12  has been -- that's really something for Congress and the

13  Executive Branch -- but not the Courts -- to weigh in on.  So I

14  would like you to address that.

15      So those are really some of the main issues I would like

16  you to focus on, but I'll allow you to raise anything you would

17  like to supplement your briefing.  Obviously, your briefing is

18  very thorough.  So you don't need to repeat everything in your

19  brief.  I have read it and -- I've read it also similar --

20  obviously, we've heard these arguments before in the last

21  briefing too.  So I'm pretty familiar with the arguments.  But

22  anything you can address to -- or say to address my concerns --

23          MS. DAHAB:  Great.  Thank you for that guidance,

24  Your Honor.

25      Am I starting here or is Mr. Greene starting?

1        THE COURT:  Well, I actually thought since I'm going

2   to --

3        MS. DAHAB:  You just asked me all those questions.

4        THE COURT:  Well, I'm going to let you go first, and

5   then I'll allow Mr. Greene to respond.  And then I'll only just

6   have the one time each.

7        So this is your shot to address my concerns.  I might have

8   a couple of additional questions as we go through, but I wanted

9   to tee up for you what -- as I went through the briefing,

10  what -- the defendants' briefing -- what my concerns were, but

11  I thought that just to manage the time better, that it would be

12  better for you to go first.

13       MS. DAHAB:  Understood.

14       THE COURT:  And then rather than giving the

15  government two shots, I would just have the government give me

16  their best argument last.

17       MS. DAHAB:  Great.  Okay.  Perfect.  Thank you for

18  that.

19       I will do my best not to repeat what we have laid out in

20  the briefing, understanding that Your Honor has read this

21  briefing or similar briefing twice already; but as the Court

22  knows, under the *Bivens* analysis or the *Abbasi* analysis, this

23  Court has to consider whether, as defendants allege, this is a

24  new context within the meaning of *Bivens* that would expand the

25  scope of *Bivens.*

1          *Bivens*, of course, is a Fourth Amendment case wherein

2     federal narcotics agents were, you know, alleged to have used

3     unconstitutional force in a search and seizure of an

4     individual.

5          In plaintiffs' view -- and I think this is clear from our

6     briefing -- that's the circumstance that we also have here.

7          To be sure, this motion is brought by supervisory-level

8     officers of, I think, different levels within the chain of

9     command that was operating as part of Operation Diligent Valor

10    in July of 2020.

11         I will start -- I think it's probably easiest to start

12    with the complaint, as Your Honor requested, to kind of walk

13    through the specific allegations of the complaint that, in our

14    view, go to these supervisory-level officers.

15         I think, generally, we describe, at least in the -- sort

16    of the introductory paragraph, the identities of these

17    supervisory-level defendants and sort of generally what their

18    roles were within the implementation of Operation Diligent

19    Valor.

20         So if the Court looks to paragraphs 25 through 30 of the

21    second amended class-action complaint, that's where we specify,

22    based on information that we learned from Mr. Clendenen,

23    primarily, over -- or, I guess, we -- we have supplemented this

24    with information we learned from Mr. Clendenen, based on what

25    those individuals were doing over the course of Operation

1    Diligent Valor and what sort of direction and control they

2    have -- or they had over the individuals on the ground here in

3    Portland.

4            THE COURT:  Let me ask you about that, Ms. Dahab, and

5    I think the defendants make this argument somewhat in their

6    briefs.  You don't dispute that there was a lot of violence and

7    destruction happening in Portland during these very same

8    protests, do you?

9            MS. DAHAB:  No, we don't dispute that.

10           THE COURT:  You don't dispute that it was legitimate

11   for the agency or supervisors to be at least responding to that

12   force and making sure that there were tactical decisions to

13   protect the Hatfield Courthouse and the area -- surrounding

14   area, do you?

15           MS. DAHAB:  No, we don't dispute that.

16       I think our position, though, at least in that respect, is

17   that these individuals had the authority to respond to those --

18   to acts of violence against both the property and the officers.

19       The Constitution, and specifically the Fourth Amendment,

20   doesn't allow them to -- or requires that response to be

21   individualized.  So it does not allow them to use broad force

22   against everyone in the crowd, and it does not permit them to

23   use any force against nonviolent or otherwise peacefully

24   protesting individuals, of which we -- of which there were

25   many.

1          THE COURT:  So tell me what is -- this is going

2     perhaps far afield from the actual complaint, but it -- but it

3     does crop up in my mind as I review the case.  What would be

4     reasonable if you had a crowd that is climbing the fence,

5     trying to write on the building, trying to break in the

6     building, and there are many people doing it?  And even though

7     there are many, presumably, innocent protesters in the vicinity

8     as well?  When you say "targeted," should they be shot with

9     munitions bullets?  That seems like -- the rubber bullets is

10    also conduct that is challenged.  So what is the response that

11    plaintiffs think should have happened?

12         MS. DAHAB:  Sure.  I suppose, by "targeted," I'm not

13    sure I intended to say "individualized."  So the response needs

14    to be directed at the violent or otherwise aggressive

15    protesters.  Whether, you know -- I think it --

16         THE COURT:  How do you individualize when there's a

17    crowd essentially swarming and then there's some innocent folks

18    there too?

19         MS. DAHAB:  Sure.  I'm not sure.  I will say I don't

20    think those are the facts that are alleged in the complaint.

21         I think the officers certainly are given some discretion

22    on the ground, in terms of the amount of force that would be

23    reasonable in the circumstances.  I don't think they're

24    allowed -- I don't think use of deadly force -- and in some

25    circumstances the force here was potentially deadly force -- is

1   reasonable in any of those circumstances, unless there is a

2   direct threat to the officers' safety as opposed to the

3   property -- you know, the -- the safety of the property itself.

4           THE COURT:  So in --

5           MS. DAHAB:  I think -- go ahead.

6           THE COURT:  In plaintiffs' view, any less lethal than

7   tear gas to -- just assuming, for the sake of argument, there

8   are groups engaged in violent or destructive conduct --

9   climbing the fence, breaking windows, shooting -- we have seen

10  a lot about what defendants say happened -- assuming, for the

11  sake of argument, those things are occurring among several

12  people in the crowd, what is less lethal or dangerous than tear

13  gas?  In plaintiffs' view, what should they have used instead

14  of tear gas?

15          MS. DAHAB:  You know, I think there are probably ways

16  for the officers to use nondispersed force.  You know,

17  direct -- directly, sort of, cabining the protesters.  I don't

18  know that there -- you know, the -- the other uses of force,

19  being munitions that they used here, are certainly not the

20  not-less-lethal.

21          THE COURT:  But how do you cabin protesters who are

22  engaging in that kind of conduct?  What is plaintiffs' -- I

23  mean, does plaintiff have an alternative to the type of force

24  that you are alleging was unlawful?

25          MS. DAHAB:  I mean, at least on the facts alleged in

 1    this case, Your Honor, I think -- you know, particularly with

 2    respect to many of the plaintiffs who were not violent, many of

 3    whom were following dispersal orders -- and I think that was

 4    the case for many class members as well -- that no force should

 5    have been used, that tear gas was -- was unreasonable because

 6    those protesters were not engaging in aggressive acts.  They

 7    were nonviolently protesting and exercising their right to do

 8    that and were lawfully following dispersal orders that the

 9    officer had -- that the officers had issued.

10        So our position is, at least as to those individuals,

11    there was no -- there should not have been any use of force.

12            THE COURT:  How would they avoid -- again, there are

13    not very many claims in your complaint that say even the

14    plaintiffs were targeted with tear gas.  You say some other

15    munitions specifically targeted.  But with tear gas, assuming

16    they were bystanders there, do you have -- or officers -- is

17    there any way to avoid tear gas affecting innocent plaintiffs,

18    for example, if they're in the crowd and there are others who

19    it's appropriate to use tear gas?  I mean, how do you avoid

20    that?

21            MS. DAHAB:  I'm not sure how you avoid it.  Frankly,

22    I don't know how you avoid that.  I don't want to concede that

23    tear gas would have been a -- particularly in a pandemic, would

24    have been a reasonable use of force under any circumstances

25    here.  And there may have been ways to, like I said, handle the

1    protesters, at least the violent protesters, individually,

2    without having to resort to tear gas at all.

3              THE COURT:  All right.  So I know I'm asking you

4    questions that go beyond really what the purpose of this is,

5    but I don't get to see you very much in the context of a

6    hearing here.

7              MS. DAHAB:  Sure.

8              THE COURT:  So I think that is something that just I

9    wanted to talk about.

10             MS. DAHAB:  No, I appreciate that.  I think it's -- I

11   know Your Honor is very cognizant of this, and I just want to

12   make clear, though, that the allegations of the complaint are

13   such that, you know, the class that we're seeking -- or the

14   plaintiffs and the class that we may eventually seek to

15   represent are nonviolent and otherwise peacefully protesting

16   individuals who were following at least the dispersal orders

17   that were issued.

18        As I say that out loud, I'm thinking that there are

19   allegations also as to the -- in this complaint about the

20   office -- the officials' failure to issue dispersal orders, in

21   the first instance, on many of these nights; and that, I think,

22   is one predicate step in response to Your Honor's questions

23   about what -- how officers should have responded even to

24   violent protesters.  The first thing that they should have done

25   is issued a dispersal order on many of these nights, and they

1    failed to do that.

2        But I think the allegations of this complaint are

3    different than the circumstances that Your Honor is describing,

4    and these allegations, particularly when you construe them in

5    favor of plaintiffs, are such that I think -- I think this is

6    getting to the qualified immunity question, which you didn't

7    ask me to focus on, but are such that there was an excessive

8    use of force here, that as -- getting us back on track here --

9    that we think squarely falls within the ambit of *Bivens*.

10        I was going through the complaint, and we were looking at

11    paragraph 25 through 30, which described generally the roles of

12    each of these supervisory officers.  Some of them were in

13    Washington and some of them were here in Portland, and

14    plaintiffs understand that.

15        If the Court turns, then, to -- I don't want to skip

16    important allegations here -- to paragraph -- and I will say

17    that the -- the complaint refers both to Doe -- John Doe

18    supervisory defendants and John Doe patrol-level defendants, as

19    well as all supervisory defendants.  And in plaintiff's view,

20    the allegations referring to all supervisory defendants include

21    the six supervisory defendants that have moved -- that have

22    filed a motion here.

23        So paragraph 4, again, generally --

24            THE COURT:  Actually, let me ask you about that,

25    Ms. Dahab.  The defendants make the point, and I think it's

1   well taken, that under *Bivens* -- a blanket allegation that

2   doesn't specify individual conduct is insufficient under

3   *Bivens*.  Is that wrong?

4            MS. DAHAB:  I think it -- I mean, I don't -- by

5   referring to all supervisory defendants, I don't think that's a

6   blanket allegation that doesn't refer to specific conduct.  The

7   allegations referring to all supervisory defendants contain, I

8   think, sufficiently specific information about the conduct of

9   those supervisory defendants to satisfy *Bivens*.

10       I think, sure, there's a level of generality that may be

11  insufficient, some of the cases acknowledge, but I don't think

12  we have that here, and I don't think that just simply referring

13  to all supervisory defendants necessarily makes the allegation

14  itself.  I don't know that I can specify the standard under

15  *Bivens*.

16       43, I think, starts a series of allegations about all

17  supervisory defendants and the fact that they were acting under

18  color of law, that they are not named herein -- some of them

19  are not named herein, and that all of those agents had

20  oversight or administrative authority or were specifically

21  dispatched to or stationed here in Portland.

22       I'm then going to skip the class action allegations and

23  turn to paragraph 60.  My apologies in advance for jumping all

24  over, but I think paragraph 60 is where we start -- start

25  setting forth particular allegations of conduct that both the

1    supervisory defendants and the patrol-level defendants engaged

2    in with respect to use of force against nonviolent or

3    peacefully protesting individuals during -- in the protest

4    zone.

5         Those allegations include, for instance, escalating the

6    violence on a nightly basis; failing to deescalate the

7    strategy -- their tactics -- to mitigate the violence;

8    targeting peacefully and lawfully dispersing individuals;

9    pursuing protesters, observers, and journalists throughout the

10   streets; and also firing some of the munitions that we describe

11   in later paragraphs of the complaint.

12        Paragraph 61 describes that the officers built the fence

13   and fired from the fence and also sometimes from higher floors

14   above the ground level at the courthouse at the direction of

15   the supervisory officers.

16        And then I think the paragraphs from -- from 65 and 66

17   also talk about the specific use of force by those supervisory-

18   and patrol-level defendants.

19             THE COURT:  And so which defendants -- so you have

20   five -- six defendants named here.  So, for example, you are

21   alleging that by actually building the fence, that subjects

22   them to a *Bivens* personal liability?  And which one is

23   responsible for that?

24             MS. DAHAB:  No.  I'm saying that they built the fence

25   or somebody told them to build the fence and the fact that

1  they're firing munitions from inside the fence and from floors

2  above the ground level, at the direction of the supervisory

3  defendants, is what gives rise to the *Bivens* liability, not the

4  construction of the fence itself.

5          THE COURT:  So the fence is not part of -- you're not

6  alleging that the -- what is the purpose of the statement about

7  the fence?

8          MS. DAHAB:  I mean, I think the fence is relevant,

9  Your Honor, to the extent that the officers are protected by

10  the fence, and they're -- it put them in a place of safety

11  from -- from otherwise violent protesters that may have been

12  there, but I think that lessened their -- the reasonableness of

13  their use of force against the protesters.

14          THE COURT:  Understood.  Thank you.

15          MS. DAHAB:  And then I'm going to skip to

16  paragraphs 70 through 76, which addressed, specifically,

17  supervisory liability.

18      I think the prior paragraphs obviously provide context for

19  what was happening, who was doing what, and the nature of the

20  force used on the protesters.

21      72 and 73 describe more specifically what these six

22  defendants were doing, which is to say that Defendants Russell,

23  Smith, and Jones were manning the incident command post within

24  the courthouse itself, watching the actions outside on live

25  feed video, while Morgan -- Morgan, Burger, Cuccinelli, and

1   Wolf -- who are no longer part of the case -- otherwise had

2   knowledge, under paragraph 73, that all this was going on on a

3   nightly basis.

4           THE COURT:  Although, does that show, again directly,

5   that they would have seen any of the specific targeting that

6   you allege happened to any of these named plaintiffs?

7           MS. DAHAB:  We allege in paragraph 76 that the

8   supervisory defendants knew of, either in real time or within a

9   day of it happening, every single one of these incidents

10  between (a) and just to (ff) of the complaint.  I don't know

11  that we allege that they saw it -- each one of those happening.

12     The people that were inside the Hatfield Courthouse,

13  watching on a live feed video, very well could have.  I don't

14  think we have enough information, and we hope to get that sort

15  of information in discovery in this case.  We don't have that

16  specific level of information, but we allege that they knew

17  that the -- all of those incidents happened either at the time

18  that they happened or shortly thereafter.

19          THE COURT:  And what do you allege that shows they

20  participated in it?  Which aspect of the complaint shows that?

21          MS. DAHAB:  I think these paragraphs show

22  participation.  I think under a standard set forth in *Starr v.*

23  *Baca* and in *Chavez v. United States*, we have to allege either

24  direct participation or information sufficient for these

25  supervisory-level -- supervisory-level officers to know what

1  was happening and not do anything about it.

2       So I don't think the standard requires us to allege that

3  they were shooting munitions themselves but that they had

4  enough information to know that that was happening and didn't

5  take affirmative steps to stop the -- the constitutional

6  violations that were occurring.

7            THE COURT:  Okay.

8            MS. DAHAB:  In plaintiffs' view, these allegations,

9  in particular 73 to 76, are where we meet that standard.

10      All of this -- all of those allegations, Your Honor, are

11  very much focused on the use of force by the officers on the

12  ground against the protesters.  They do not seek to challenge

13  the executive order that led to the -- that led to the

14  stationing of those officers in Portland to protect the

15  Hatfield Courthouse.

16      I think that is a -- we tried to make that more clear in

17  our briefing on this -- on the second round.  I think it -- in

18  many ways that distinguishes these six officers whose motion

19  currently is before the Court from Defendants Wolf and

20  Cuccinelli, who truly are -- who were -- I don't want to

21  concede anything as to Wolf and Cuccinelli, but they were, you

22  know, political appointees who were high -- who were at the

23  highest level making the policy decisions and implementing the

24  policies at the direction of the President.

25      These officers, I think, are differently situated, in the

1    sense that they are not -- not making the policy decisions.  We

2    are not challenging those policy decisions.  They are on the

3    ground, watching excessive uses of force occur as they occur

4    and not taking steps to prevent it, and I don't think anybody

5    argues here that those uses of force were contemplated by the

6    policy that they were -- that were -- that they were stationed

7    to carry out.

8        All of that, I think, squarely puts this case in the

9    context of *Bivens* and doesn't require an expansion of *Bivens*

10   for this Court to allow this cause of action against the

11   officers.

12       *Abbasi* makes clear, I think, that that case -- you know,

13   the defendants' motion cites a lot of statements from *Abbasi*

14   that casts doubt on the validity of *Bivens*.  *Abbasi* makes very

15   clear that it was not intended to do that and that *Bivens*, as a

16   fixed principle of law and a principle on which litigants have

17   relied for decades, still exists.

18       I don't think this is a new context because we have --

19   again, as I have just described, we have those specific uses of

20   force.  We have the Fourth Amendment context in which *Bivens*

21   arose and federal officers engaging in excessive uses of

22   forces -- force or unlawful searches and seizures against

23   individuals.

24       I think *Abbasi* itself contemplates that the fact that

25   these are supervisory-level officers, as opposed to

1    patrol-level officers, does not make this a new context.  One

2    of the factors that goes to whether a context is new, as the

3    Court knows, is whether we're dealing with a new category of

4    defendants.

5        And the Court has acknowledged that claims, for example,

6    against federal agencies or claims against private prison

7    officials or claims against private individuals are all new

8    categories of defendants that require -- otherwise require an

9    expansion of *Bivens*.  This is not that.  These are claims

10   against individuals for Fourth Amendment violations that they

11   were involved in and directly involved in for 30 days in a row

12   in July of 2020.  It is -- it is very much precisely within the

13   framework of what *Bivens*, I think, recognizes.

14       And I say that *Abbasi* contemplates this because there was

15   one claim in *Abbasi* that the Supreme Court remanded for

16   analysis of special factors, and that was the claim against the

17   warden, and it -- in *Bivens* itself -- you know, *Bivens* -- I'm

18   sorry -- in *Abbasi* itself, the Supreme Court says, yes, this is

19   a new context because it's a different constitutional right at

20   issue.

21       It says, you know, the supervisory liability case law in

22   the Eighth, Fifteenth -- Eighth, Fifth Amendment prison context

23   isn't as clear, but it doesn't say that the fact that a warden

24   is a supervisor necessarily makes that a new context.

25       Here, by contrast, we -- the fact that these are

1  supervisors, as contemplated in *Abbasi*, does not make it a new

2  context, and we have plenty of precedent, I think, that

3  established the standard for how these supervisory-level

4  officers should have -- or what they should have done or what

5  makes them liable under the Fourth Amendment, when they do --

6  when they act in the manner that is alleged here, when they

7  watched the constitutional violations happen.

8          THE COURT:  Are you alleging that all use of tear gas

9  during the period July 1 to July 20 was unlawful?

10          MS. DAHAB:  We're alleging that the indiscriminate

11  use of tear gas was unlawful, to the extent that it was used

12  indiscriminately against crowds that were not violent.

13          THE COURT:  So does that mean all use would be

14  unlawful because -- I think it's common knowledge that there

15  were peaceful protesters and then not-so-peaceful protesters

16  so -- and tear gas spread; so is all of it unlawful, in your

17  view -- is that part of your claim? -- and that's what the

18  supervisors knew?

19          MS. DAHAB:  To the extent that the -- I mean, our

20  position is that the --

21          THE COURT:  I guess maybe the question is what does

22  "indiscriminate" mean?

23          MS. DAHAB:  Sure.  When you -- I guess, when the

24  officers used tear gas as use of force, and in Your Honor's

25  example, tear gas, against crowds of individuals, some of whom

1    are nonviolent, some of whom are dispersing pursuant to a

2    dispersal order and are otherwise -- and against whom even the

3    use of tear gas would be unlawful or unreasonable, that's

4    indiscriminate.  Right?  The officers have to act in a

5    particular -- particularized way, and they have to do so with a

6    warning to protesters.

7        So I think that the use of tear gas here, without a

8    warning to all protesters no matter how they were acting, was

9    unlawful.

10        THE COURT:  Okay.  Go ahead.  I interrupted you.  Go

11    ahead.

12        MS. DAHAB:  No, it's okay.

13        I was talking about *Abbasi*.  I think that the upshot of

14    what I was trying to say is that the fact that these were

15    supervisors does not make this a new *Bivens* context.  And that,

16    I think, is directly contemplated by the fact that the Supreme

17    Court did not shut down the supervisory liability claim against

18    the warden in Abbasi itself.

19        All of the other -- I don't want to repeat all the factors

20    for the Court that we, I think, sufficiently set forth in our

21    briefing; but in our view, these officers are not so high level

22    as, perhaps, Wolf and Cuccinelli were, such that they would --

23    they would categorically become a new context, and they were on

24    the ground.  Many of them were in the courthouse.  Many of them

25    were watching on a live feed video day in and day out for 30

1   days as these constitutional violations happened.

2       The fact that -- again, the fact that they're supervisors

3   doesn't make this automatically a new context.  And in

4   plaintiffs' view, none of the other factors that the Supreme

5   Court has articulated that might otherwise give rise to a new

6   context under *Bivens*, does not do so here.

7       I don't know if it -- I want to be as helpful for the

8   Court as possible and, like I said, not repeat our briefs, but

9   the special factors analysis, I think, you know, even if the

10  Court were to find that this would be a new context under

11  *Bivens*, if it -- if it is not a new context, obviously the

12  inquiry stops there.  If you were to find that it is, we also

13  don't think that special factors counsel against the

14  expansion -- you know, we're not challenging, as we have -- as

15  I have described, we're not challenging high-level policy

16  decisions here.  We're challenging the direct participation of

17  the supervisory officers as they watched the constitutional

18  violations occur every day in July.

19          THE COURT:  Aren't you challenging the use of tear

20  gas to disperse crowds -- a policy?

21          MS. DAHAB:  Well, that -- that was -- we are

22  challenging the officers' decisions here to use excessive force

23  against protesters.  Some of that was a policy decision that

24  was made.  We are not challenging that policy decision.  We're

25  challenging the decisions that the officers made on the ground

1    and the force that they used in particular cases against

2    individuals.

3              THE COURT:  All right.

4              MS. DAHAB:  So I want to make that very clear.  If

5    there were policies in place here, we do not challenge those

6    policies.  We're not challenging executive order or any

7    other -- or any of the other policies that may have existed to

8    implement the executive order.  I don't know if we know what

9    those are because we haven't gotten discovery yet, but we are

10   challenging the individual decision that the officers made on

11   the ground to control, for crowd control purposes, on the

12   nights in question.

13             THE COURT:  Okay.

14             MS. DAHAB:  Okay.  The other special factors, in our

15   view, don't -- again, don't counsel hesitation toward

16   expansion.  If the Court finds this is a new context, there

17   really is no other remedy here.  Our injunctive relief has

18   already been dismissed.  I don't think there's an APA claim,

19   although the defendants seem to bring that up several times,

20   and the FTCA the Court has already -- the Supreme Court has

21   already held that is not a factor that counsels against

22   expansion.

23        All the workability concerns about this being a class

24   action or these being motive-based claims, which they are not,

25   are also not relevant factors.

1    I think, at bottom, these are Fourth Amendment claims, and

2   the Supreme Court has already contemplated that even in the

3   supervisory capacity they're still Fourth Amendment claims that

4   can fall within the original context that *Bivens* existed to

5   provide.

6    I will stop there and not address qualified immunity

7   unless this Court has particular questions on that piece.

8             THE COURT:  No, I don't.

9    Let me just ask:  Would you have an APA claim if your

10   challenge was to the policy of using tear gas?

11            MS. DAHAB:  If there was a policy in place, that

12   would -- I suppose a policy would be a final agency action.  So

13   there may be an APA claim against a policy.  We are not

14   challenging any policy in that regard.

15            THE COURT:  Understood.  Thank you, Ms. Dahab.

16    Why don't I hear from Mr. Greene.

17            MR. GREENE:  Thank you, Your Honor.  I'll do my best

18   to not repeat the -- what we have argued or repeat much; so I

19   guess I should lead -- I'm assuming the Court can hear me?

20            THE COURT:  Yes, I can hear you.

21            MR. GREENE:  I'll just lead with our -- the

22   inclination of our clients -- Defendants Burger, Cline, Jones,

23   Morgan, Russell, and Smith -- is that the Court is correct to

24   be inclined to dismiss the claims against them because we

25   believe that in the same -- for the same reasons that the Court

1    found there was a new context with respect to the claims

2    against Defendants Wolf and Cuccinelli, we believe the new

3    context that's presented here is the exact same context, and we

4    believe that the same reasons that the Court found to counsel

5    against a remedy are applicable here.

6          We noted five reasons why a new context is presented.

7    There were two that the Court cited in Clark:  The rank of the

8    defendants and the specificity of the alleged conduct.  Counsel

9    noted that they alleged the identities and roles with respect

10    to what happened or with respect to Operation Diligent Valor in

11    that the response to crowds had to be individualized, but the

12    Supreme Court has recognized that legal allegations and

13    liability must also be individualized, and that is not present

14    in this complaint.

15          The Court has already, in the claims against

16    Defendants Wolf and Cuccinelli, declined to attribute the

17    multitude of allegations that cite defendants generally, and

18    supervisory defendants declined to attribute those to Wolf or

19    Cuccinelli, and those should not be attributed to these

20    defendants.

21          And when those allegations are removed, what you have are,

22    by my count, four allegations that name any of these defendants

23    specifically.  Defendants Burger and Cline -- there's nothing

24    alleged beyond the titles that they held and the

25    responsibilities of their former government positions, and

1    there's an allegation that Defendant Cline stood next to

2    Chad Wolf at a press conference.  There's an allegation with

3    respect to Defendant Morgan that he made statements about

4    officers lead in Portland, which isn't really a constitutional

5    violation, as far as I can tell.

6         And what is left are allegations -- an allegation

7    involving Defendants Russell, Smith, and Jones about their

8    presence at an incident command post, but there's no allegation

9    that they observed any particular misconduct directed at any of

10   the specific plaintiffs.  And in that regard, I think reliance

11   upon cases like *Chavez* or cases -- or a case like *Chavez* or

12   *Starr* is misplaced.

13        In *Chavez* the Court -- which was a *Bivens* case -- the

14   Court addressed supervisory liability or alleged -- attempted

15   to hold supervisors liable for unconstitutional traffic

16   stops -- allegedly unconstitutional immigration traffic --

17   immigration-related traffic stops, and the Court specifically

18   found that the only supervisor that could be held liable, where

19   an allegation was sufficient to potentially hold them liable,

20   was a supervisor who was alleged to have actually stopped

21   traffic.  He actually stopped cars.  He wasn't -- the Court

22   found that an allegation that was based -- that tried to hold

23   the commissioner of the agency liable based on his title, that

24   that wasn't sufficient.  I know it wasn't sufficient to allege

25   that someone was liable because they had authority over

1   operations, and it wasn't sufficient to hold someone liable

2   because they had received complaints about unlawful conduct.

3        The only -- the only supervisor held liable was someone

4   who actually participated in the conduct directed at a specific

5   plaintiff, and those allegations are not present here,

6   Your Honor.

7        In terms of the knowledge and acquiescence, there are no

8   *Bivens* cases that had -- that a Supreme Court in these cases,

9   in which knowledge and acquiescence, has been sufficient,

10  certainly not in the Fourth Amendment context to hold

11  liability.

12       In *Carlson* the Court found awareness of a medical

13  condition, coupled with the fact that the person was in custody

14  and there was a duty to -- there was a duty to address that

15  medical condition, that specifically found liability.  But just

16  general knowledge of wrongdoing being done by others or

17  subordinates was not sufficient to establish liability.

18       In terms of the argument that these -- these defendants

19  are in a different situation or different place, in terms of

20  the policy allegations, that's not really -- that's

21  contradicted by the nature of the allegations in plaintiffs'

22  complaint.

23       In plaintiffs' complaint, they specifically say that --

24  they admit the policy-based nature of their -- of their -- of

25  *Bivens* claims.  In paragraph 134 they allege that the

1   supervisory defendants -- the quote/unquote "supervisory

2   defendants" -- adopted and implemented a policy -- adopted and

3   implemented a policy of deploying excessive force against

4   everyone that protested in the vicinity of the Hatfield -- of

5   the Hatfield Courthouse, and they further say that their

6   injuries were the moving force.  I'm sorry.  They say that the

7   moving force behind their injuries was this policy.  So they're

8   admitting the policy-based nature of their claims and tying

9   that to -- tying the policy -- a policy or multiple policies to

10  their -- to their injuries.

11         The claim that they're not --

12         THE COURT:  Mr. Greene, which paragraph of the

13  complaint is that?  Can you remind me?

14         MR. GREENE:  That was paragraph 134.

15         THE COURT:  Okay.  Thank you.

16         MR. GREENE:  Yes.  And the next paragraph, in

17  paragraph 135, they state that their -- that these -- this

18  policy was the moving force behind their alleged injuries.

19         Moreover, the claim that they're not challenging policy is

20  contradicted by the nature of their allegations.  As I noted

21  and as we say in our complaint, Your Honor -- I'm sorry -- in

22  our motion, the entire complaint -- the second amended

23  complaint contains a handful of allegations that directly

24  identify any of these six defendants.  The claims are premised

25  upon these defendants' alleged knowledge and direction of

1  unlawful detentions or excessive force by line-level officers

2  against a subset of protestors that happen to include

3  plaintiffs.

4       They are challenging decisions that were made with respect

5  to these officials that purportedly led to the collective

6  mistreatment of a group of people.  And those are, by

7  definition, claims that challenge the application of a general

8  policy that affected plaintiffs and others in similar -- that

9  affected plaintiffs and others in similar ways.

10      That's in contrast to the claims that the Ninth Circuit

11  recognized in *Reid* as being *Bivens* claims or what *Bivens* claims

12  are typically -- to address, which are claims against

13  rank-and-file federal officers for an officer's individualized

14  mistreatment of a specific plaintiff.

15      In terms of the -- and, moreover, with respect to the new

16  context inquiry, I think it's -- in a recent Ninth Circuit

17  en banc opinion -- *Boule* -- the Ninth Circuit found that even

18  that case, which involved -- involves -- *Boule* is actually

19  before the Supreme Court now, but the en banc panel of the

20  Ninth Circuit found that a claim in which an individual alleged

21  that he was assaulted by a federal officer on his own property,

22  that that Fourth Amendment claim was a modest extension of

23  *Bivens* because it involved a CBP officer as opposed to an FBI

24  agent.

25      So I don't -- I think that based on even Ninth Circuit

1    case law, it's difficult to make the argument that claims that

2    are challenging, things that happened allegedly over a 30-day

3    period of time, involving a multitude of defendants and actions

4    by line-level officers that were supposedly observed or

5    directed or had knowledge of by the supervisors, that that's

6    not a new context.  I think that is a difficult argument to

7    make in light of even Ninth Circuit case law, let alone Supreme

8    Court case law.

9         In terms of the -- the rank of the defendants, it's -- the

10   specific levels, the ranks of the defendants, these positions,

11   don't really matter.  What matters is that they're not

12   line-level officers being sued for their specific conduct being

13   directed towards a specific plaintiff, that therefore they're

14   being sued under a theory of supervisory liability and the

15   direct participation arguments are conclusory and are not

16   sufficient to state a claim against these defendants.

17        So, again, I don't want to repeat our filings too much,

18   Your Honor.  If the Court has other questions, I'm happy to

19   address them.

20             THE COURT:  All right.  No.  I think I'm satisfied.

21        All right.  So I'm going to take this under advisement.  I

22   should have a decision out quickly, but I want to think about

23   your arguments and look at some of the cases again that you

24   just mentioned.

25        So that's my current status of that motion.

1          Then let's turn to the motion to compel discovery.

2          It seems like the government has provided a number of

3    incident reports that they complied with.  I believe they have

4    complied with the order that I previously issued when we had

5    our last hearing just about identities of officers who were

6    involved during the period of time alleged in the complaint

7    involved in use-of-force incidents.  At that time there wasn't

8    a request for specific incident reports, but I understand

9    that -- or there may have been a request.  I didn't order that,

10   but I know the government has provided some of those incident

11   reports.

12          MS. DAHAB:  No.  Now, we've -- well, we have received

13   from the government a list of names only.  They have not

14   produced any incident reports to us.

15          THE COURT:  All right.  So you can advise me -- I'll

16   hear probably, Ms. Dahab, what you have and haven't had and

17   what you're looking for.  Let me tell you what my inclination

18   is and then you can tell me if I'm right or wrong.

19          Again, while I'm deciding the supervisory agent motion to

20   dismiss, I don't believe at this stage you're entitled to a

21   30(b)(6) deposition.  So my inclination is that I would -- I

22   don't know if it's in the status of asking for an order about

23   that, but I would not compel those depositions is my

24   inclination.

25          My inclination is that you're entitled only to incident

1    reports regarding the specific incidents not involving tear

2    gas, but the other munitions that are alleged in the complaint

3    with regard to your named plaintiffs, and -- rather than every

4    night of tear gas because at this point it's not clear to me

5    that the tear gas class survives under *Bivens*.  So I'm going to

6    give you limited discovery.

7         Again, I haven't -- that issue hasn't been teed up for me,

8    but I think it's within my discretion and appropriate for you

9    to try to determine not just the identity of officers who were

10   on but officers that were on for that specific -- incident

11   reports related to the specific time period of the specific

12   plaintiff with the allegation that is in the complaint.

13        So, for example, Plaintiff Maher states that on July 22nd,

14   between approximately 12:30 and 1:00 a.m., a federal agent

15   wearing camouflage -- he beat her with a baton when she was

16   walking away.  I would -- my inclination is you get that

17   incident report or incident reports that could be -- or from

18   that time period regarding use of force.

19        And, similarly, there's another one from 2:00 to 3:00 a.m.

20    Struck in the head by a munition.

21        So it has to be very specific.  Again, I'm just telling

22   you my inclination, and I'll hear from you both, but very

23   specific -- only with regard to the specific allegations.

24   Again, that's where the individual complained -- plaintiffs say

25   they were targeted specifically.  Not the broad "I took in tear

1   gas that was being sprayed."  That's why -- that's too broad at

2   this stage, but -- so at this stage I'll allow just the

3   specific incidents that are given up with non-tear gas, unless

4   there was "tear gas sprayed in my face purposely on a

5   particular date and time," which I don't think that is in the

6   complaint; but if it is, it's specific targeting.

7        So, first, let me ask Mr. Clendenen.  Is what I have

8   just -- again, I'm just saying it's my inclination.  I'll let

9   you argue, but would that be a clear order from me that the

10  government could comply with?

11            MR. CLENDENEN:  Your Honor, I think it's clear

12  enough.  I think so.  I'm hesitant just to say it's definitely

13  because we don't -- I haven't discussed with agencies whether

14  or not there's an easy way to, you know, cleave off the tear

15  gas use versus other uses of force.  It should be.  The

16  use-of-force reports, I believe, should indicate what sorts of

17  munitions were used, at least in most cases; but I think it's

18  at least possible to comply with that.

19            THE COURT:  And let me say the underpinning of my

20  inclination is, I think, plaintiffs should be able to get --

21  it's insufficient simply to -- and I realize that, really,

22  probably my giving plaintiffs just the identity of all officers

23  previously doesn't really get to the identity of the officer

24  involved in the alleged behavior, and there -- it seems to me

25  that the only specific alleged behavior that one could

1   accomplish getting to the identity of that officer and then,

2   obviously, you know, it gets litigated on whether there was a

3   motion to dismiss or -- but at least to identify the officer

4   involved in the incident regarding Plaintiff Maher, for

5   example, is to look at incident reports regarding use of force

6   that -- regarding batons, you know, regarding the specifics of

7   what that plaintiff alleges at the time period and place that

8   plaintiff alleges it.  And if it's not sufficiently specific,

9   they don't get it.

10      But I think they're entitled and it's within the Court's

11  discretion to afford them that limited discovery because

12  identity of officers generally is not helpful.  What they need

13  is officers engaged in the specific conduct that they have

14  alleged is violative of their rights.

15                  MR. CLENDENEN:  That's understood, Your Honor.  Yes.

16                  THE COURT:  So I haven't walked through those

17  specifics.  And my order, I think, is going to be broader than

18  that; but, if necessary -- I don't think it should be disputed.

19  Either they gave enough specificity that it is -- you know,

20  general time, date -- not the whole summer, but general time,

21  date, and what happened, that the government could match up

22  reports that would potentially get, from that specific

23  information, incident reports that -- again, I'm not saying

24  they can't be redacted if there is information that should not

25  be conveyed, but they're -- I think they're deserving to get

1    the identity of the officer involved in the incident that

2    they're complaining happened, and I don't know how else to

3    accomplish that and move this case forward without that

4    information.

5        So why don't I hear first -- but I just wanted to make

6    sure that was clear, Mr. Clendenen, before I hear from

7    Ms. Dahab why she should get the rest of the information that

8    they seek.

9             MS. DAHAB:   Thank you, Your Honor.

10       I think that what you have just articulated is certainly

11   within the scope of information that we seek, and I think in

12   our motion we tried to ask for the names of particular officers

13   and the method of force used at specific locations against the

14   plaintiff.  So I think that is consistent, at least in part

15   with what we -- what we ask for.  I want to make clear -- and

16   maybe I made this -- we talked about this a little bit in the

17   argument on the motion to dismiss.  I apologize if I'm

18   restating our position on this.  I just want to make sure that

19   I've stated clearly our position on this tear gas issue and

20   what conduct by the federal officers, in plaintiffs' view, is

21   violative of their rights with respect to tear gas.

22       It's plaintiffs' position that if there's a nonviolent

23   protester in a crowd or if there's nonviolent protesters in a

24   crowd of violent protesters, that use of tear gas against all

25   the protestors violates the rights -- is an excessive use of

1   force because the use of tear gas, just like the use of the

2   other munitions that we describe in the complaint, has to be

3   individualized.  It has to be specifically, you know, targeted

4   based on the conduct of the person being targeted.

5        So I think that's consistent with the case law.  I just

6   want to make that very clear, to the extent that I didn't

7   before.

8        Just, obviously, in our view, the use of tear gas against

9   these plaintiffs, as well, violated the Constitution, and so we

10  should be entitled to those -- to those reports as well and the

11  information pertaining to the identity of the officer and the

12  location of the use as to our particular plaintiffs.

13       So that is the basis of our request on that -- on that

14  issue.

15            THE COURT:  And the reason I'm not -- I understand

16  that's a basis of your claim; and, again, I see the tear gas

17  class as quite different from the -- what you call, I think,

18  the shooting class.

19            MS. DAHAB:  Uh-huh.

20            THE COURT:  I think those are quite different.

21       And, again, we're not here to litigate that issue now.

22            MS. DAHAB:  Right.

23            THE COURT:  But it seems to me at this stage, before

24  anyone has been served, when you're not entitled and officers

25  haven't been able to challenge either -- move to dismiss on any

1    basis, including qualified immunity, that it is overly

2    burdensome to request incident reports involving tear gas,

3    which appears to have been used every night.

4         So that means an incident -- and I don't know.  I'm not

5    sure what the practice is of the agencies or multiple agencies

6    involved in tear gas or not.  I'm just not familiar with the

7    policy.  But it seemed to me that that is too much of a burden

8    at this stage in the proceedings, and so I'm trying to limit, I

9    think, something that is your -- you should be entitled to the

10   specific instances.

11        So that's why I have at this stage -- and I'm not saying

12   you would never get it.  I'm just -- at this stage, I think

13   this will get the case moving, hopefully.

14        Ms. Dahab, go ahead.

15         MS. DAHAB:  Well, I don't mean to interrupt

16   Your Honor.

17        I want to, I guess -- I guess, make -- I guess, flag two

18   things.  The first is that I don't think the government is

19   arguing that the provision of the tear gas information is

20   unduly burdensome.  I certainly understand they're arguing that

21   depositions would be such, and I under -- you know, I

22   understand Your Honor's decision on that piece.  If the tear

23   gas information is part of the incident report, it strikes me

24   that it may not be unduly burdensome for them to produce that

25   information and may be more burdensome for them to redact it.

1           THE COURT:  Understood.  And I'm not saying to

2    exclude tear gas.  I'm just trying to home in on the specific

3    incidents that you've alleged.

4           MS. DAHAB:  Yeah.  Yeah.  Sure.  Okay.

5           THE COURT:  I think the allegation regarding

6    indiscriminate use of tear gas is quite broad at this stage; so

7    I'm trying to balance the competing interests of what is

8    appropriate to ask the government to produce at this stage when

9    people haven't been served yet.  We're just -- you're just

10   trying -- and your claim was --

11          MS. DAHAB:  Sure.

12          THE COURT:  You just wanted to identify the officers,

13   and now you have all the names of officers who were involved in

14   the incidents, but you don't have it narrowed down for the

15   specific claims involving your named plaintiffs.

16      So that's what I'm trying to help move forward.

17          MS. DAHAB:  Sure.  Yeah.  And we appreciate that.

18   We, likewise, would like this to move forward.  So I think this

19   information will help.

20      The other thing that will help and the other thing we have

21   asked for in the motion to compel is service addresses for

22   these individuals, which we also don't have.  And service, as

23   Your Honor knows in this case, has been very difficult,

24   primarily because we're dealing with agencies that are not

25   fully operational because it's a -- because of the pandemic,

1    and so we aren't able to complete service inside buildings.

2        I think the Department of Justice has made clear that, at

3    least in this circumstance, that they're not -- they have not

4    been able to accept service.  I don't know if that has changed,

5    but if it has not changed, we would also ask the Court to

6    order -- to order the government to provide service addresses

7    so that we can continue to move this forward.

8            THE COURT:  All right.  So let me -- Mr. Clendenen,

9    so assuming that that is -- the order I issue is as I

10   described, what -- how do you -- first of all, would the

11   government be -- is there any objection to providing service

12   addresses or accepting service, to the extent officers can be

13   identified that are consistent with the allegations that

14   plaintiff -- named plaintiffs are making in the complaint?

15           MR. CLENDENEN:  So, Your Honor, to start with,

16   accepting service -- the Department of Justice itself, like

17   myself, we can't accept service on behalf of individual

18   defendants.  In some instances, including, I believe, for some

19   of the defendants who are in this case, there are attorneys who

20   are assigned to represent individual defendants, such as

21   Mr. Greene, and they can, if authorized by their client, accept

22   service on behalf of those defendants.  That would be the only

23   instance in which the DOJ could accept service, and that could

24   happen here.

25           I think to the more general point about whether we object

1  to turn over service addresses, we would object -- it doesn't

2  seem appropriate before the defendants have even been named.

3  It seems as though the more appropriate sequence of events

4  would be for the plaintiff to name the defendants in the

5  complaint.  Potentially, they'll have a representative assigned

6  to them quite quickly, and the representative can accept

7  process, or maybe the plaintiff can serve them in some other

8  way.  And if after a certain period of time they have exhausted

9  all -- all means, then they can make a motion for service

10  addresses.

11      But the point of the early discovery is just to identify

12  the defendants.  So the service addresses is a whole separate

13  issue that doesn't need to happen at this point.

14          THE COURT:  Ms. Dahab?

15          MS. DAHAB:  I think -- I'm worried that we're

16  speaking past each other.  We have named several -- we have

17  named many of these supervisory- and patrol-level officers

18  under pseudonyms, at the Court's direction, but have been

19  unable to serve them because -- for the reasons I have

20  described before.

21      So those are also the service addresses that we're looking

22  for because we have not yet been able to complete service on

23  those individuals.

24          MR. CLENDENEN:  Your Honor, I didn't quite understand

25  plaintiffs to be seeking the service addresses of the

1    already-named defendants.  I thought they were asking for

2    service addresses just with regards to the -- you know, the new

3    identities that would come through the follow-on discovery.

4        With regards to the already-named defendants, I would say

5    that the plaintiffs should submit a separate motion and explain

6    what efforts they have made to serve those defendants already,

7    and in that they can ask for service addresses, and then we can

8    respond appropriately.

9            THE COURT:  All right.  And I assume, Ms. Dahab,

10   you're referring to the FPS supervisory officers numbers 2, 6,

11   8, 14, et cetera?  Is that what you're referring to?

12           MS. DAHAB:  All of those, yes.  Yes.  There's many of

13   them.

14           THE COURT:  And then some by initials and then others

15   by number.  Okay.

16           MS. DAHAB:  And, I mean, we can certainly prepare a

17   separate motion, Your Honor.  I think the service issue is

18   really the main thing that is slowing this case down, and so to

19   the extent that we're seeking to move it forward, you know,

20   I -- if the Court would be willing to construe this motion to

21   also encompass -- that's certainly what it was intended to

22   encompass -- those service addresses as well -- because of the

23   reasons that we have articulated in several prior motions of

24   our difficulties in completing service on these defendants.

25           THE COURT:  All right.  Let me ask, Mr. Clendenen --

1  why don't I have you all confer on -- it sounds like you're not

2  disputing that at some point, after sufficient effort on

3  plaintiffs' part, they could be entitled to get the service

4  addresses.  Why don't you confer and find out what steps

5  plaintiffs have taken with regard to the named officers.

6       I think your point is well taken on you having to -- the

7  Doe defendants are not yet named and -- or at least the ones --

8  I'm sorry -- the supervisory- and patrol-level defendants

9  1 through 140 are not named.  So your point is, I think,

10  correct that, you know, they need to be named first.  And,

11  again, I'm still having, at this stage of the proceeding, based

12  on our -- I think it was our very first hearing -- that they

13  would be identified by number or some other pseudonym rather

14  than actually having their names on the complaint because it

15  was established that there was a security risk.

16       So it would be helpful, if it hadn't happened, that you

17  have a conferral with Ms. Dahab and see if there's some way to

18  more easily effect service.  I don't want to have them

19  identified by name.  And that does pose, I would assume,

20  additional challenges for plaintiffs with regard to service.  I

21  mean, if it doesn't, then I'm wrong on that, but if -- I'm

22  trying to both protect the officers' identities, at this stage,

23  until we know that they are viable participants in this lawsuit

24  and -- but also speed things up.

25       So I'm not going to order right now that the government

1   provide the service addresses, but that is something I would be

2   inclined to do if a lot of effort has been made by the

3   plaintiffs.  So knowing that, hopefully you can confer and come

4   to an agreement without having to come back to me for that, or

5   get permission to accept service.  However they would prefer to

6   do it.

7        So the only order I'm making is conferral on the issue of

8   providing service addresses for the named individuals in the

9   complaint -- in the second amended complaint.

10        All right.  Any other questions, Ms. Dahab?

11             MS. DAHAB:  I don't think so, Your Honor.

12             THE COURT:  Mr. Clendenen, any additional issues with

13   regard to the discovery?

14             MR. CLENDENEN:  No, Your Honor.

15             THE COURT:  All right.  So I'll stick with, then, my

16   inclination.  My order is that the government should provide

17   incident reports that are directly tied to the specific

18   incidents alleged only by the named plaintiffs with regard to

19   instances where they were -- they allege they were specifically

20   targeted.  So there's some where the named plaintiffs -- again

21   I'm going back to tear gas -- they were affected by tear gas,

22   but it doesn't allege that they were specifically targeted, and

23   so I'm not requiring those to be turned over.  Just where they

24   allege they were specifically targeted at a certain time and

25   place and that -- for the most part, those appear to be

1  non-tear-gas incidents, based on my memory of the complaint.

2      All right.  So let's -- maybe we've talked, actually,

3  about the status of the case now with regard to these other

4  parties.

5      What is the status of serving any of these others,

6  Ms. Dahab?  Has anybody else been formally served?

7          MS. DAHAB:  I should have pulled this before I came

8  into this hearing.  I apologize that I didn't.  I think that we

9  have had -- we named one other person by name, and I think we

10  were able to complete service on Leonard Eric Patterson.

11     The other -- the other pseudonymed defendants we have not,

12  to my knowledge.  I need to double-check.  We have sent process

13  servers out several times but have not been able to complete

14  service on them.

15         THE COURT:  And then with regard -- I note that you

16  had -- who -- so Leonard Eric Patterson is -- what role is that

17  person?

18         MS. DAHAB:  This is in paragraph 31 of our complaint.

19  Director of the Federal Protective Service.

20         THE COURT:  Okay.  And I note Donald Washington was

21  head of the U.S. Marshals Service.

22     So you're still --

23         MS. DAHAB:  I'm sorry.  I think the folks that we

24  have identified by name we were able to complete service on

25  them.  I -- with the -- with one -- I think there was one

1    exception.  I apologize I don't have all the detailed

2    information for the Court this morning.

3        Most of the pseudonymed defendants we have not, but a few

4    of the named ones we have.

5            THE COURT:  All right.  Mr. Greene, do you know if

6    those -- is DOJ representing some of those supervised -- they

7    were high-level supervisory personnel that ran the agencies.

8    Is that -- have they answered, or do you -- anything you can

9    tell me about the status?

10           MR. GREENE:  At this point, Your Honor, we -- I am

11   only representing the defendants that we filed motions on

12   behalf of.  I don't represent anyone other than the folks

13   that -- the six defendants before the Court today and

14   Defendants Cuccinelli and Wolf.

15           THE COURT:  Okay.

16           MR. GREENE:  I believe that other defendants have

17   submitted requests for representation, and they may still be

18   being processed.

19           THE COURT:  All right.  Okay.  Thank you.

20       All right.  Is there anything else, from plaintiffs'

21   perspective, that you think I need to take up today?

22           MS. DAHAB:  I don't think so, Your Honor.  We

23   submitted -- we had a Rule 26 conference with Mr. Greene and

24   submitted a report.  So I think the discovery that we seek

25   there really -- I think that the dispute there centers on the

1   resolution of the motion to dismiss that we just argued and any

2   discovery we might get in the meantime; but other than that, I

3   can't think of anything else.

4          THE COURT:  All right.  I'll ask you the same

5   question, Mr. Greene and Mr. Clendenen.  I did have a question,

6   because I know that there are a number of other cases,

7   including ones assigned to me, that are very similar and even

8   some -- I note there are cases or paragraphs in this complaint

9   that are actually cases that -- those people brought their own

10  cases independently; so I assume they are not members of the

11  class here, such as Mr. LaBella.  I know another judge has that

12  case.  I have the Protest Medic cases and a lot of them are

13  named here, but it seemed to me -- and I'm just trying to find

14  the cases -- whether there is -- somehow whether it makes

15  sense -- and, obviously, I don't have all of those.  There's

16  not necessarily complete overlap, but I think there's a large

17  overlap of the lawyers.  Ms. Dahab and I -- let's see.  I

18  have -- Kristiansen, Cohen, Mead, Haberman-Ducey,

19  Jessie-Uyanik, and Ketcher are all excessive force cases.  Is

20  there -- I want to make sure we're really using judicial

21  resources efficiently here.

22         MS. DAHAB:  Sure.

23         THE COURT:  And is there -- and not repeating the

24  same motions in every case, and it looks like the defendants

25  are largely the same.  Is there -- have you talked about --

1  with the government about whether there's a way at least to
2  consolidate, for purposes of discovery or motions, so that we
3  don't waste everybody's time?
4        MS. DAHAB:  Sure.  I think, with the Court's
5  permission, I'm inclined to defer to Mr. Park or Ms. Burrows on
6  this.  I'm not -- I'm not counsel of record on those Individual
7  cases.  I know they have had conversations with the government
8  about potentially consolidating some of those cases.
9     And we, of course, would be fine with consolidating for
10 the purposes of discovery with the class case.
11       THE COURT:  Mr. Park or Ms. Burrows, any input you
12 want to give on that?
13       MR. PARK:  Dave Park, Your Honor.  The individual
14 cases have been consolidated for purposes of motions to
15 dismiss.  The individual cases should not be -- well, they
16 might have certain common aspects of discovery, but each are
17 discrete, separate incidents on separate dates, involving
18 different officers, different people, different supervisors.
19 It would make no sense to really consolidate those for
20 discovery.
21       THE COURT:  So in those cases you are not going to be
22 seeking the broader information about the -- everything going
23 on during the time period?
24       MR. PARK:  Those cases are specific serious injury
25 cases, Your Honor.  We're focusing on the officers that are

1   directly involved in inflicting the harm.

2           THE COURT:  All right.  Understood.

3       What about -- Mr. Greene, I don't know if this -- are you

4   on each of these cases also?

5           MR. GREENE:  Yes, Your Honor.  As it so happens, I am

6   on those cases.  Those cases involve the same six defendants

7   who are on the motion to dismiss here, and the Department is

8   representing everyone except for Mr. Smith, I believe, who I

9   believe is represented by private counsel.  There's one

10  defendant who is represented by private counsel.

11      But we had filed a motion to dismiss on behalf of the

12  defendants we represent, and the other defendant, I believe,

13  filed a motion as well; so that -- that is, I believe,

14  currently before the Court awaiting a response from plaintiffs.

15          THE COURT:  All right.  From your perspective,

16  Mr. Greene, is there some way that I can manage these more

17  efficiently or that you can manage them more efficiently by

18  combining any of the aspects of the case, or is it, as Mr. Park

19  says, not really helpful?

20          MR. GREENE:  Well, I know that we have already taken

21  steps to make this more efficient by moving -- we asked for a

22  consolidation for the motions with respect to these high-level

23  supervisors because the allegations against them are all

24  substantially similar throughout the cases.  So that is

25  efficient from that perspective.

1          With respect to the allegations involving specific

2     incidents and what line-level officers were involved, I guess I

3     would have to defer to Mr. Park on that.  It would seem to me

4     that you could do discovery -- if you are alleging different

5     incidents on different days, maybe you can't really do -- if

6     you're focusing on those sole incidents, maybe you can't do a

7     consolidated discovery on that if you are just looking at

8     discrete incidents, but -- but maybe you can.  I'm not sure.

9          But certainly with respect to the high-level supervisors

10    that have been sued, we -- we are -- we have consolidated and

11    we've moved on behalf of all of those in one motion because the

12    allegations against them are substantially similar to the

13    allegations before the Court today in this case.

14              THE COURT:  All right.  So I appreciate that.  If

15    there is -- so I won't do anything about it today.  It's

16    just -- if either I find or you find that it is more efficient

17    to combine some of the aspects of the cases, you know,

18    certainly I would like to come up with the most efficient way

19    to do it.  So keep that in mind as you move forward.

20         And if I'm seeing the same motions in every single case

21    boilerplate, then I think I would prefer to do it as one, even

22    though -- understanding that they are -- might have some

23    different claims that would warrant a different result.  It

24    doesn't always have to be all exactly the same.

25         Mr. Clendenen, I did not ask you whether you weigh in on

1    this.  I know you're involved in some of the discovery issues.

2    Is there anything you wanted to say about consolidating some of

3    the cases?

4              MR. CLENDENEN:  Your Honor, I don't really have

5    anything to add.  With the exception of the Clark case, I'm

6    only involved in the cases that have claims for injunctive

7    relief.  So the ones that you listed, I don't have any

8    oversight over it, at least at this time.

9              THE COURT:  All right.  Understood.

10       All right.  So, Mr. Greene, is there anything else you

11   wanted -- you think I need to address today?

12             MR. GREENE:  No, Your Honor.  Thank you for your

13   time.

14             THE COURT:  All right.  And, Mr. Clendenen, anything

15   from you?

16             MR. CLENDENEN:  No, Your Honor.

17             THE COURT:  And, Ms. Dahab, I already asked you, but

18   last word?  No?

19             MS. DAHAB:  Nothing further from us.  Thank you,

20   Your Honor.

21             THE COURT:  All right.  Thank you, everybody.  We'll

22   be in recess, and I hope to have a decision out to you quickly.

23       And we'll do a minute order just regarding the discovery.

24   Thank you so much.

25             MS. DAHAB:  Great.  Thank you.

1            MR. CLENDENEN:  Thank you.

2            MR. GREENE:  Thank you, Your Honor.

3                    (Hearing concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2            Angelica Clark, et al. v. Chad Wolf, et al.

3                         3:20-cv-01436-IM

4                    Telephonic Status Conference

5                         January 12, 2022

6            I certify, by signing below, that the foregoing is a true

7    and correct transcript, to the best of my ability, of the

8    telephonic proceedings heard via conference call, taken by

9    stenographic means.  Due to the telephonic connection, parties

10   appearing via speakerphone or cell phone or wearing masks due

11   to coronavirus, speakers overlapping when speaking, speakers

12   not identifying themselves before they speak, fast speakers,

13   the speaker's failure to enunciate, and/or other technical

14   difficulties that occur during telephonic proceedings, this

15   certification is limited by the above-mentioned reasons and any

16   technological difficulties of such proceedings occurring over

17   the speakerphone at the United States District Court of Oregon

18   in the above-entitled cause.

19           A transcript without an original signature, conformed

20   signature, or digitally signed signature is not certified.

21

22   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____

23

24   Official Court Reporter        Signature Date: 1/26/2022
     Oregon CSR No. 98-0346         CSR Expiration Date:  9/30/2023

25